**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| LOUIS FROBE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | 11 CV 1722 |
| The VILLAGE OF LINDENHURST, a | ) | |
| municipal corporation, Lindenhurst Police | ) | |
| officers RALPH H.GOAR, JOHN E. MARS, | ) | Judge Pallmeyer |
| and JOHN F. FISHER, Lake County State's | ) | |
| Attorney MICHAEL J. WALLER, and Illinois | ) | Magistrate Judge Denlow |
| Attorney General LISA MADIGAN, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

Plaintiff, LOUIS FROBE, by and through his attorneys, Hamilton Law Office, LLC, and

The Law Office of Thomas P. Needham, respectfully submits this memorandum of law in

opposition to Defendants' motions to dismiss Plaintiff's Complaint.

## INTRODUCTION

Plaintiff, Louis Frobe, is a forty-eight-year-old disabled resident of Lake Villa, Illinois, who

has for many years, suffered from a degenerative spinal disease. *Compl.* ¶¶ 5, 16. Plaintiff's condition

causes him to suffer severe and chronic pain, which he manages with prescription medication. *Id.* ¶

16. Unable to participate in the activities he used to enjoy, Plaintiff has developed outdoor hobbies

such as observing nocturnal wildlife in its natural habitat. *Id.* ¶ 17. Because he is often outside in the

middle of the night in suburban Lake County, Plaintiff has had repeated encounters with police,

during which he has been stopped, unlawfully searched, interrogated, and even arrested. *Id.* ¶¶ 18-

20. As a result of these experiences, Plaintiff purchased a video camera to record his interactions

with police so that he could protect himself from false charges, and also so that he could use the

recordings to redress civil rights violations committed by local police officers. *Id.* ¶ 26.

On August 15, 2010 at approximately 10:30 p.m., Plaintiff was pulled over by a Lindenhurst police officer, Defendant Goar. *Id.* ¶ 21. Defendant Goar's squad car was itself equipped with video and audio recording devices, and Defendant Goar used both to record his entire encounter with Plaintiff. *Id.* ¶¶ 22, 24. Plaintiff, who was unaware that he was being recorded by Defendant Goar, did not believe he was speeding. *Id.* ¶ 27. Thus, when Defendant Goar returned to his squad car with Plaintiff's drivers' license, Plaintiff used his video camera to record the area where he had been pulled over so that he could use the recording as evidence to defend what he believed was a bogus speeding ticket. *Id.* ¶ 27. When Defendant Goar returned to Plaintiff's vehicle, he informed Plaintiff he was going to issue him a warning and handed him back his driver's license. *Id.* at ¶ 28. At that time, however, Defendant Goar noticed Plaintiff's video camera, asked if the video camera was recording, and Plaintiff answered truthfully. *Id.* ¶¶ 29-30. Defendant Goar then ordered Plaintiff out of his vehicle, and informed him he was under arrest for violation of the Eavesdropping statute. *Id.* ¶ 31.

Subsequently, Defendants Goar and Mars searched Plaintiff's vehicle and belongings and found his prescription medications along with copies of his paper prescriptions, which Plaintiff kept with his medications at all times. *Id.* ¶¶ 34-35. At the police station, after the State's Attorney declined to approve charges against Plaintiff, Defendants Goar, Mars and Fisher conspired together to disregard Plaintiff's paper prescriptions, and charge him with felony drug possession. *Id.* ¶¶ 38-40. Ultimately, these charges were dismissed when Plaintiff presented his valid prescriptions to the prosecutor. *Id.* ¶ 45.

Plaintiff has brought this lawsuit seeking redress for damages against the Lindenhurst defendants the wrongs he suffered, and also for prospective relief since he continues to have late night encounters with police in Lake County and he desires to be able to protect himself by recording these encounters. *Id.* ¶¶ 47-49. Defendants have filed three separate motions to dismiss

Plaintiff's complaint arguing that the federal claims should be dismissed and, consequently, that this Court should decline to exercise supplemental jurisdiction over the state malicious prosecution claim. Plaintiff files this combined memorandum in opposition.

## STANDARD OF REVIEW

In deciding a motion to dismiss brought pursuant to FRCP 12(b)(6), a court must review the complaint's factual allegations and draw all reasonable inferences from those facts in the light most favorable to the plaintiff. *Autry v. Northwest Premiums Servs., Inc.,* 144 F.3d 1037, 1039 (7th Cir. 1998). A Rule 12(b)(6) motion may only be granted if it appears from the four corners of the complaint, that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The liberal notice pleading standard of federal practice applies equally to civil rights claims brought pursuant to section 1983. *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coord. Unit,* 507 U.S. 163, 164-169 (1993). Under this current notice pleading standard in federal courts a plaintiff need not "plead facts that, if true, establish each element of a cause of action…" *Sanjuan v. American Bd. Of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir. 1994). The plaintiff need not allege all of the facts involved in the claim and can plead conclusions. *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir. 2002).

## ARGUMENT

In his complaint, Plaintiff has set forth six claims: a First Amendment claim (Count 1); False Arrest & Unlawful Search claims (Counts 2 and 3); a §1983 Conspiracy claim (Count 4), a *Monell* policy claim[1] (Count 5) and a malicious prosecution[2] claim under Illinois law (Count 6). Defendants have moved to dismiss all of Plaintiff's claims and essentially, their arguments are four-fold. First,

---

[1] Lindenhurst's motion to dismiss Plaintiff's policy claim depends on the same arguments it makes for dismissal of the underlying claims, and thus will not be separately addressed here.

[2] Defendants do not specifically seek the dismissal of Plaintiff's malicious prosecution claim, instead suggesting that this Court should decline to exercise supplemental jurisdiction over it.

Defendants argue that Plaintiff's claims are barred by the Eleventh Amendment, and second, that

Plaintiff does not have standing to challenge the constitutionality of the Eavesdropping statute.

Third, Defendants argue that Plaintiff has not alleged a claim upon which relief can be granted since

his arrest for a violation of the Eavesdropping Statute did not violate the First Amendment. Fourth

and finally, Defendant Officers argue that since there was probable cause to arrest Plaintiff under

the Eavesdropping statute, his Fourth Amendment claims must also fail. Plaintiff contends he has

adequately plead each of his claims, and Defendants' motions to dismiss should be denied in their

entirety.

## I.   The Eleventh Amendment Allows This Court To Grant Equitable Relief To Prevent On-Going Civil Rights' Violations Instigated By An Unconstitutional Statute, And Defendants Waller And Madigan Are Proper Parties To This Suit[3].

Defendants Lisa Madigan and Michael Waller erroneously argue that the Eleventh

Amendment bars the Plaintiff's claims against them. *Def. Madigan's Mem.*, pp. 4-6; *Def. Waller's Mem.*

pp. 5-6. They incorrectly contend that the exception to state sovereign immunity first recognized in

*Ex Parte Young,* 209 U.S. 123 (1908), requires two elements: that the state officer have "some

connection" to the enforcement of the statute and that the officer "threaten" to enforce it. *Def.*

*Madigan's Mem.,* p. 4, *Def. Waller's Mem.* p. 6 ¶ 2. The Plaintiff asserts, however, that the alleged

"threat to enforce" requirement is unsupported by any Seventh Circuit or Supreme Court decision

and it is not required. Since the Defendants concede that they meet the "some connection"

requirement, (*Def. Madigan's Memo.*, p. 5 n.1; *Def. Waller's Mem.* at 6 ¶ 2), and the Plaintiff seeks only

prospective relief on his First Amendment claim, the Eleventh Amendment does not bar Plaintiff's

claims.

---

[3] The Lindenhurst Defendants also complain that they are not proper parties to Plaintiff's First Amendment claim. However, it is the Lindenhurst police department and the Defendant Officers who enforced Illinois' Eavesdropping statute by arresting Plaintiff, and they could easily do so again. Thus, Plaintiff has asked this court to enjoin any further enforcement of the Eavesdropping Act by Lindenhurst police.

**A. Plaintiff's complaint sufficiently alleges on-going constitutional violations and seeks only declaratory and injunctive relief against Defendants Waller and Madigan.**

Plaintiff has sought only prospective relief on his First Amendment claim. The Supreme Court recently reaffirmed that to decide the Eleventh Amendment issue, this Court "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Verizon Md., Inc. v. Pub. Serv. Comm'n. of Md.*, 535 U.S. 635, 645 (2002)(quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in the judgment)). Ordinarily, a simple allegation of a continuing violation of federal law combined with a request for prospective relief is adequate. *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 281. Thus, in a case where state officials are charged with enforcement of a law asserted to violate the First Amendment, the alleged ongoing violation of federal law sufficiently satisfies this inquiry. *Entm't Software Ass'n. v. Blagojevich,* 469 F.3d 641, 645 (7th Cir. 2006). By their very nature, injunctions are prospective and are therefore a proper form of relief under *Ex Parte Young. Verizon Md., Inc.*, 535 U.S. at 645-46.

Plaintiff sufficiently alleges in his complaint that he wishes to remedy an ongoing violation of the U.S. Constitution. *Compl.* ¶¶ 46, 51, 55. Plaintiff's complaint clearly seeks only prospective relief on his First Amendment claim, by requesting declaratory and prospective injunctive relief to prevent further constitutional violations as a result of an unconstitutional statute. *Id.* ¶ 51. Plaintiff's complaint passes the Supreme Court's straightforward inquiry test and the Eleventh Amendment does not bar his First Amendment claim.

**B. Both Defendants Madigan and Waller have sufficient connection to the enforcement of the Illinois Eavesdropping Statute to be proper parties to this suit.**

Plaintiff does not dispute that the *Ex Parte Young* exception to Eleventh Amendment sovereign immunity requires that the state official have "some connection" to the enforcement of the challenged statute. *See Ex Parte Young*, 209 U.S. at 156. However, this requirement is fulfilled by

the mere the *ability* to enforce the law, even where neither the statute nor the officer's primary duties explicitly authorize any enforcement power. *Entm't Software Ass'n*, 469 F.3d at 645. Both Defendants Madigan and Waller concede that they have the ability to enforce the Eavesdropping statute, and thus have the requisite connection to satisfy *Ex Parte Young. Def. Madigan's Mem.*, p. 5 n.1; *Def. Waller's Mem.*, p. 6 ¶ 2.

Defendant Waller is the is the duly elected prosecutor in Lake County, Illinois, responsible for the oversight of all criminal prosecutions, and empowered to prosecute and thereby enforce all laws in Lake County, Illinois, including the Eavesdropping Act. *Compl.* ¶ 8. Defendant Madigan is a duly elected public official of the State of Illinois, and he chief legal officer for the State of Illinois. *Compl.* ¶ 9. In fact, if Plaintiff had not named Defendant Madigan, Federal Rule of Civil Procedure 5.1(a)(2) would have required Plaintiff and this Court to notify and serve her, and would have allowed her the opportunity to intervene.

Rule 5.1. Constitutional Challenge to a Statute — Notice, Certification, and Intervention

(a) NOTICE BY A PARTY. A party that files a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute must promptly:

\* \* \*

(2) serve the notice and paper on the Attorney General of the United States if a federal statute is questioned — or on the state attorney general if a state statute is questioned — either by certified or registered mail or by sending it to an electronic address designated by the attorney general for this purpose.

(b) CERTIFICATION BY THE COURT. The court must, under 28 U.S.C.§ 2403, certify to the appropriate attorney general that a statute has been questioned.

(c) INTERVENTION; FINAL DECISION ON THE MERITS. Unless the court sets a later time, the attorney general may intervene within 60 days after the notice is filed or after the court certifies the challenge, whichever is earlier. Before the time to intervene expires, the court may reject the constitutional challenge, but may not enter a final judgment holding the statute unconstitutional.

Thus, as a practical matter, federal law recognizes that the state attorney general has a significant enough connection to the enforcement of all state statutes, that it specifically grants her

the right to intervene in any suit challenging the unconstitutionality of any state statute. Both Defendant Waller and Defendant Madigan clearly have the requisite connection to the enforcement of the Eavesdropping statute to be proper parties to this suit.

### C. The Seventh Circuit has never recognized a threat to enforce requirement; Plaintiff need only show that his fear of consequences is not "imaginative or speculative."

Defendants Waller and Madigan argue that they are not proper Defendants in this matter because they have not threatened to prosecute violations of Illinois' Eavesdropping Statute. Defendants' contention that *Ex Parte Young* requires that the state official threaten to enforce the statute is unfounded. The Defendants do not cite to any controlling authority for their "threat to enforce" requirement, and several significant cases point in exactly the opposite direction. Defendants' argument here ignores the Seventh Circuit's recent decision in *Entertainment Software Association*, which does not mention a threat to enforce requirement. 469 F.3d at 644-45. On the contrary, the plaintiffs in that case brought a suit one day after enactment of the statute and did not claim that a state officer had threatened to enforce it. *Id.* at 643. In addition, the court in that case specifically rejected a broad reading of an earlier decision that the defendants purported required a threat of enforcement. *Id.* at 645 (citing *Sherman v. Cmty Consol. Sch. Dist. 21 of Wheeling Twp.,* 980 F.2d 437 (7th Cir. 1992)). Rather, the proper focus is that there is an ongoing violation of federal law by state officials that demands federal intervention. *Verizon Md., Inc.,* 535 U.S. at 645; s*ee also Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999).

Since Defendants Lisa Madigan and Michael Waller concede that they have the requisite connection to the enforcement of the statute, (*Def. Madigan's Mem.*, p. 5 n.1; *Def. Waller's Mem.*, p. 6 ¶ 2), and since Plaintiff seeks only prospective relief against enforcement of an unconstitutional statute, (*Compl.* ¶¶ 46, 51, 55), Defendants' Eleventh Amendment argument fails.

### II. Plaintiff Has Sufficiently Alleged His Standing To Challenge The Constitutionality of The Illinois Eavesdropping Statute.

Defendants argue that Plaintiffs' First Amendment claim should be dismissed because the Plaintiff does not have standing to challenge the Illinois eavesdropping statute. *Def. Madigan Mem.* p. 2, 6, *Def. Waller Mem.,* p. 3, *Def. Lindenhurst Mem.,* p.12.  According to Defendant Madigan the Plaintiff "does not come close to establishing that he will be falsely charged with a crime or experience police misconduct," *Def. Madigan Mem.,* p. 7. According to the defendant Waller, the circumstances of this case "nearly eliminate the probability of future prosecution." *Def. Waller Mem.,* p. 5. Finally, the  Lindenhurst Defendants claim Plaintiff lacks standing because "[t]here is nothing that would suggest that the specific conditions spelled out in the Complaint would recur." *Def. Lindenhurst Mem.,* p.14. These arguments misapprehend both the law that governs rules for standing in the context of a First Amendment challenge, and further, disregard the facts pled in Plaintiff's complaint.

Plaintiff has alleged a First Amendment challenge to the constitutionality of the Illinois Eavesdropping Act as applied to a specific set of circumstances: the audio recording of police officers performing their official duties, in public places, when the officers are speaking in a manner audible to the unassisted ear. *Compl.* ¶ 57. It has long been recognized that a person is not required to risk prosecution in order to challenge a penal statute on constitutional grounds. *Steffel v. Thompson*, 414 S. Ct. 452, 459 (1974). The *Steffel* Court explained that to hold otherwise would be to force a person to choose between "intentionally flouting state law" and "forgoing what he believes to be constitutionally protected activity." Very recently, the Seventh circuit stated that "[i]t is well-established that 'pre-enforcement challenges . . . are within Article III.'" *Ezell v. City of Chicago*, ___F.3d___ (decided July 6, 2011) quoting *Brandt v. Village of  Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010). Furthermore, courts have traditionally relaxed the standing requirements in cases where there is a challenge to statutes based on the First Amendment, something that the Seventh circuit has called a "special flexibility, or "breathing room," that attaches to standing doctrine in the First

Amendment context." *Sequoia Books, Inc. v. Ingemunson*, 901 F.2d 630, 634 (7th Cir. 1990). See also

*Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001) (the "injury requirement is most loosely applied .

. . where First Amendment rights are implicated"); *Ruocchio v. United Transp. Union*, 181 F.3d 376, 385

(3rd Cir. 1999) ("[C]ourts have been expansive in their view of standing to bring legal action in

situations where free speech rights are implicated.")

It is not necessary for Plaintiff to demonstrate that he "*will be* falsely charged with a crime"

or that he "*will be* the victim of law enforcement misconduct," as the Defendant Madigan argues.

*Def. Madigan Mem.*, p. 7 (emphasis added). In fact, Plaintiff is not even required to show that he was

threatened with arrest or prosecution. *Majors v. Abell*, 317 F.3d 719 (7th Cir. 2003). In *Majors,*

political activists filed suit to challenge an Indiana law which made it a misdemeanor criminal

offense to distribute a campaign advertisement that failed to identify who had paid for the

advertisement. *Id.* The district court dismissed the case, ruling that the plaintiffs had no standing, but

the Seventh Circuit reversed, stating:

> "The judge's ruling on standing was incorrect. A plaintiff who mounts a pre-
> enforcement challenge to a statute that he claims violates his freedom of speech
> need not show that the authorities have threatened to prosecute him. . . the threat
> is latent in the existence of the statute. Not if it clearly fails to cover his conduct,
> of course. But if it arguably covers it, and so may deter constitutionally protected
> expression because most people are frightened of violating criminal statutes,
> especially when the gains are slight . . ." 317 F.3d at 721 (*citations omitted).*

The Seventh Circuit has reiterated this point more recently in *Brandt,* another First

Amendment standing case. 612 F.3d 647  Brandt had frequent fundraisers for prominent political

figures in his Winnetka home. *Id.* at 648. The village of Winnetka enacted an ordinance requiring

that homeowners who hosted such events be required to pay for the cost of any "special services"

associated with it (such as extra police and security, and traffic management issues). *Id.* Brandt

himself was never asked to reimburse the village for any of the events held at his home, although

other persons who sponsored other such gatherings had been billed under the ordinance. *Id.*

Nevertheless, Brandt brought an action under 42 U.S.C. §1983 asking for a declaratory judgment that the Winnetka ordinance violated the First Amendment since it had a chilling effect on his desire to invite political figures to his home. *Id.* The district court dismissed his case, ruling that he lacked standing. *Id.* at 649.

The Seventh Circuit reversed, reasoning that "[a]lthough a court cannot be *sure* that Brandt will again have a guest whose protection detail will ask the Village for 'special services,' the probability is materially greater than zero." *Id.* (*emphasis in court's opinion*). The Court went on to state that "[i]njury need not be certain. Any pre-enforcement suit entails some element of chance: perhaps the plaintiff will desist before the law is applied, perhaps the law will be repealed, or perhaps the law won't be enforced as written." *Id.*

To support his standing argument, Defendant Waller relies on *Lawson v. Hill*, 368 F.3d 955 (7th Cir. 2004), but the facts in that case were dramatically different than in this one. In *Lawson* the prosecutor made clear and public his intentions *not* to prosecute any violations of the statute in question and instructed law enforcement officials in his community not to arrest people for the offense. *Id.* at 956. The Seventh Circuit in *Lawson* held that the plaintiff lacked standing since she was "seeking to prevent [the prosecutor] from doing something he has no intention of doing." *Id.* at 960. Here, we have no such declaration of intention by Defendants Waller or Madigan. In fact, in both of their briefs before this Court they argue the constitutionality of Illinois Eavesdropping Act as applied to Plaintiff and the actions which led to his arrest in this case. There is no reason to conclude that either official "has no intention" of prosecuting violations of the Eavesdropping Act for the recording of police officers, in fact, the exact opposite is true.

Of course, we cannot be "sure" that the Plaintiff will be arrested again for violating the Illinois eavesdropping law. But that sort of certainty is not required for Plaintiff to have standing to challenge this statute. Plaintiff has alleged that he is frequently stopped and questioned by police in

10

Lake County where he lives, and that this has occurred approximately forty times. *Compl.* ¶ 19.

Plaintiff has alleged that on April 15, 2010, the Plaintiff was arrested for the felony of eavesdropping

for recording a police officer who was himself recording the Plaintiff, that the Plaintiff's camera and

other property were seized, that the Plaintiff was brought in handcuffs to a police station where the

officers contacted the Lake County State's Attorney's Office and requested the formal filing of

felony charges against him. *Compl.* ¶¶ 21, 31, 32, 39. Plaintiff has alleged that because of his

problems with the local police, he desires to record his future encounters with them, but Illinois'

Eavesdropping statute is preventing him from doing so for fear of being arrested again. *Compl.* ¶¶

48-50.

Moreover, the threat of prosecution for this offense is obviously real, given that there are

have been multiple such prosecutions in recent years all over the state. *See People v. Drew*, No. 10-

CR-4601 (Cook County Cir., charges filed Dec. 15, 2009); *People v. Moore*, No. 10-CR-15709 (Cook

County Cir., charges filed Aug. 31, 2010); *People v. Thompson*, No. 04-CF-1609 (6th Cir., Champaign

Co., 2004); *People v. Wight*, No. 05-CF-2454 (17th Cir., Winnebago Co., 2005); *People v. Babarskas*, No.

06-CF-537, (12th. Cir., Will Co., 2006); *People v. Lee*, No. 08-CF-1791 (12th. Cir., Will Co., 2008);

*People v. Allison*, No. 09-CF-50 (2nd Cir., Crawford Co., 2009); *People v. Parteet*, No. 10-CF-49 (16th

Cir., Dekalb Co., 2010); *People v. Biddle*, No. 10-CF-421 (16th Cir., Kane Co., 2010); *People v.

Fitzpatrick*, No. 10-CF-397 (5th Cir., Vermillion Co., 2010); and *People v. Gordan*, No. 10-CF-341

(11th Cir., Livingston Co., 2010). Thus, since 2004, at least nine different prosecutors have charged

at least thirteen civilians with violating the Act by audio recording on-duty police officers. Five of

these prosecutions were initiated in 2010 alone which indicates an increasing tendency to prosecute

these offenses which coincides with the increasing availability of hand-held technology capable of

creating recordings.

Plaintiff has alleged a desire to record his encounters with local police, but he is frightened to

11

do so because he has already been arrested for this once. *Compl.* ¶¶ 48-50. As was stated in *Majors v. Abell*, "most people are frightened of violating criminal statutes." 317 F.3d at 721. Based on these facts, which at this stage of the proceedings must be accepted as true, the Plaintiff has standing to pursue a declaratory judgment and injunctive relief as requested in his complaint.

## III. The Illinois' Eavesdropping Statute, As Applied, Violates The First Amendment.

The First Amendment to the U.S. Constitution prohibits any law "respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." *U.S. Const. Amend I.* The Illinois Eavesdropping statute as applied to the recording of on-duty police officers in public places, violates the First Amendment's freedom of speech, freedom of the press and the right to petition the Government for redress of grievances. Plaintiff has asked this Court for declaratory and injunctive relief to prevent further First Amendment violations instigated by an unconstitutional statute.

### A. History of the Illinois Eavesdropping Act

The current version of the Illinois Eavesdropping Act criminalizes the use of a machine to record certain conversations – even if the conversations are not private. Specifically, the Act provides that "[a] person commits eavesdropping when he. . . [k]nowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or any part of any conversation . . . unless he does so . . . with the consent of all of the parties to such conversation . . . ." 720 ILCS 5/14-2(a)(1)(A). The Act defines "eavesdropping device" to include "any device capable of being used to hear or record oral conversation . . . ." and "conversation" to mean "any oral communication between 2 or more persons *regardless of whether one or more of the parties intended their communication to be of a private nature under circumstances justifying that expectation.*" 720 ILCS 5/14-1(a) and 720 ILCS 5/14-1(d)(emphasis added).

12

### The Original Version of the Illinois Eavesdropping Act

Illinois' Eavesdropping Act was originally enacted in 1961. The State interest the Act was intended to address was the privacy of its citizens. The legislative history of the Eavesdropping Act demonstrates that the Act's purpose was to guard against the secret recording of *private* conversations. "[T]he framers of the statute intended the term 'eavesdropping' to refer to the listening to or recording of those oral statements intended by the declarant to be of a private nature. Eavesdropping is not merely the listening to or recording of any oral communication." *People v. Klingenberg*, 339 N.E. 2d 456, 459 (Ill. App. Ct. 1975).

### The Illinois Supreme Court's <u>Beardsley</u> Decision

In keeping with the original intent of the Eavesdropping statute, in 1986, the Illinois Supreme Court held that the recording of a police officer during a traffic stop did not violate the Eavesdropping Act. *People v. Beardsley*, 503 N.E. 2d 346 (Ill. 1986). The *Beardsley* case involved a motorist, who while detained in a police car after a traffic stop, audio recorded two officers conversing in the car. *Id.* at 347-48. The court noted that the officers "plainly revealed" their words to the motorist; that the motorist was not "listening secretly"; and that the motorist "could have made notes or transcribed" the conversations and then "testified concerning it." *Id.* at 352. Relying upon the common law definition of "eavesdropping," Illinois' highest court held that a person could only eavesdrop when the parties intended the conversation to be private in the first place. *Id.* at 350. The Illinois Supreme Court held that an element of the Eavesdropping offense created by the then-existing version of the Act required "circumstances which entitle [the parties to a conversation] to believe that the conversation is *private* and cannot be heard by others who are acting in a lawful manner." *Id.* at 349-50 (emphasis added). The relevant inquiry, the Court held, was whether the parties had a reasonable expectation that their conversation was private. *Id.* at 350. Since Beardsley had recorded the conversation of on-duty police officers during the performance of their official

13

duties, the police officers had no expectation of privacy and the motorist did not violate the law. *Id.*

### The 1994 Amendment Made The Act Unconstitutional

Subsequently, and in direct response to the *Beardsley* decision, the Illinois legislature extended the Eavesdropping Act, specifically to criminalize the recording of police officers engaged in their official duties. In 1994, Illinois amended the Eavesdropping Act with Public Act 88-677. This new law adopted the current definition of "conversation," to wit: "any oral communication between 2 or more persons regardless of whether one or more of the parties intended their communication to be of a private nature under circumstances justifying that expectation." On May 19, 1994, during Senate floor debate regarding this bill, the Senate sponsor stated that the bill had earlier passed out of that chamber "to reverse the *Beardsley* eavesdropping case . . . ." *See Senate Transcript of Regular Session Debate on H.B. 356*, 1994 Gen. Assemb., 88th Sess. 42 (Ill. 1994) (Statement of Sen. Dudycz). This extension of the original eavesdropping statute has created on-going constitutional violations which need to be addressed by the federal judiciary.

### The Act Now Prohibits Civilians From Recording Police But Allows Police To Record Civilians

Moreover, the Illinois Eavesdropping Act allows the police to record citizens, but not the reverse. The Act exempts certain audio recordings by law enforcement officials of conversations between law enforcement officials and members of the general public. The Act allows uniformed police at their discretion and without a warrant to record their conversations with civilians during any "enforcement stop," an expansive statutory term that includes but is not limited to "traffic stops," "pedestrian stops," "motorist assists," "roadside safety checks," "emergency assistance," and "requests for identification." 720 ILCS 5/14-3(h), 3(h-5), 3(h-10), 3(k), 3(1). Thus, uniformed police may record any of their conversations with civilians, while civilians would be subjecting themselves to 15 years in prison for recording those same conversations.

The purported legislative purpose of these statutory exemptions was to deter and detect

14

police misconduct, and also to rebut false accusations of police misconduct. The legislative sponsor of the 2009 expansions of these exemptions (Public Act 96-670) stated that they were sought "by local law enforcement." *House Transcript of Regular Session Debate on H.B. 1057*, 2009, Gen. Assemb., 96th Sess. 83 (Ill. 2009) (Statement of Rep. Dugan). The Bill's sponsor also explained that the audio recording of police-civilian encounters serves the public interest because:

> When there's audio, then there is no question as to what was said or what wasn't said and if someone is accused of doing something or saying something, this is the proof that they would have as a citizen also, not only for protection of law enforcement, but for the citizens to have the proof in hand as to what actually happened at that particular [moment].

*Id.* at 83-85 (endorsing "protection for both" police and civilians).

### *The 1994 Amendment Made Illinois' Eavesdropping Act Abnormal And Overbroad*

The current Illinois Eavesdropping Act is one-of-a-kind in this nation. Illinois is the only state which specifically criminalizes the recording of conversations "regardless of whether one or more of the parties intended their communication to be of a private nature." 720 ILCS §14-1(d). The federal government, 39 states, and the District of Columbia, all criminalize the recording of conversations only where the participants have a reasonable expectation of privacy.[4] Nine states' eavesdropping statutes are silent on this point.[5] Only two of the silent statutes have been interpreted to extend the prohibitions on audio recording to conversations whether or not there is a

---

[4] *See* 18 U.S.C. § 2510(2); Ala. Code§ 13A-11-30(1); Ariz. Stats. § 13-3001(8); Cal. Pen.Code§ 632(a) & (c); Colo. Stats. § 18-9-301(8); 11 Del. Code§ 2401(13); D.C. Code§23-541(2); Fla. Stats. § 934.02(2); Ga. Code§ 16-11-62(1); Ha. Stats. § 803-41; Idaho Code§ 18·6701(2); Iowa Code§ 808B.1(8); Ky. Stats. § 526.010, Commentary by Ky.Crime Comm'n; La. Stats. § 15:1302(14); 15 Maine Stats. §§ 709(4)(B) & 709(5); Md.Code, Cts. & Jud. Proc. §10·401(2)(i); Mich. Laws§ 750.539a; Minn. Stats. §626A.01(4); Mississippi Code § 41·29·501G); Missouri Stats. § 542.400(8); Nebr.Stats. § 86·283; Nev. Stats. § 179.440; N.H. Stats. 570 A:1; N.J. Stats. § 2A:156A 2(b); N.Y. Penal Law§ 250.05, Commentary by Donnino; N.C. Stats. § 15A 286(17); N.D. Code§ 12.1-15-04(5); Ohio Code§ 2933.51(B); 13 Okl. Stats. § 176.2(12); 18 Pa.Stats. § 5702; R.I. Laws§ 12-5.1-1(10); S.C. Code § 17-30-15(2); S.D. Laws§ 23A-35A-1(10); Tenn. Code § 40·6·303(14); Tex. Grim. Pro. Code § 18.20(2); Utah Code77·23a·3(13); Va. Code§ 19.2·61; Wash. Code§ 9.73.030(1)(b); W.V. Code§ 62·1D·2(h); Wise. Stats. 968.27(12); Wy. Stats. 7·3·701(a)(xi).

[5] *See* Alaska Stat. §42.20.310 (2010); Ark. Code Ann § 5-6-120(a)(2010); Conn. Gen. Stat. §52-570d(a)(2011); Ind. Code §35-33.5-1-5(2011); Mass. Gen Laws ch. 272, §99(B)(4)(2010); Mont. Code Ann. §45-8-213(1)(c)(2009); N.M. Stat. §30-12-1(B)(2010); N.Y. Penal Law §§250.00(1), .05(McKinney 2011); Or. Rev. Stat. §165.540(1)(c)(2011).

reasonable expectation of privacy: Massachusetts and Oregon. However, both states' eavesdropping bans are enforced more narrowly than in Illinois. In Massachusetts, the ban does not include those who inform the speakers or just "hold the tape recorder in plain sight," and in Oregon the ban does not apply if the speaker is "specifically informed" of the recording. *Commonwealth v. Hyde*, 750 N.E.2d 963, 971 (Mass. 2001); Or. Stats. §165.540(1)(c). Since the 1994 Amendment, the Illinois Eavesdropping statute has been the broadest in the nation.

In the overwhelming majority of states, where application of the wiretapping law is limited to conversations where parties have a reasonable expectation of privacy, individual citizens provide street-level oversight of police officers. In Illinois, where the recording of even the most widely seen public conduct is criminalized, those same people face prosecution. As such, the application of the Illinois Eavesdropping Act is limited not by parties' reasonable expectation of privacy, as in most states, but instead by officers' decisions about which recordings they want shielded from public exposure and which recordings they deem suitable for public viewing.

### The Act Is Now Being Misused to Cover Up Police Misconduct

Allowing the recording of police officers engaged in their official duties serves an important and worthwhile goal. The problem with the current version of this statute is that it puts the ability to collect such evidence solely in the hands of the police. This law vests them with utter and complete discretion to decide when a recording constitutes a criminal offense and when it does not.

In practice, that discretion has been exercised only to criminalize recordings that show the recorded officer in a negative light. Police officers do not object to the recording of heroic or innocuous conduct, it's only the recording of objectionable police conduct that has been subject to prosecution. Police officers performing their public duties in public places, and speaking at a volume audible to the unassisted human ear, have no reasonable expectation of privacy that the words they speak will not be heard by unintended parties, or recorded, published, and disseminated. This focus

16

on a "reasonable expectation of privacy" was the original focus of the Illinois Eavesdropping Act when the law was constitutional. *See, e.g. Cassidy v. Amer. Broadcasting Co.*, 377 N.E.2d 126 (First. Dist. 1978)(holding that the conduct of a on-duty police officer is a legitimate area of public interest and an officer has no reasonable expectation of privacy in his conversations). Since the 1994 Amendment, this law has become unconstitutional, and Plaintiff asks this Court to declare its unconstitutionality and enjoin Illinois State actors from enforcing it.

### *The Act Also Creates Heightened Penalties For Recording the Police*

Finally, adding insult to injury, the Illinois statute creates a heightened penalty for civilians recording police officers, as opposed to civilians recording civilians. Recording the police is a Class 1 felony, punishable by a sentence of up to 15 years in prison. 720 ILCS 5/14-4(b); 730 ILCS 5/5-4.5-30. Recording another civilian is a class 4 felony, punishable by a sentence of up to 3 years in prison. 720 ILCS 5/14-4(a); 730 ILCS 5/5-4.5-45.

### B. The First Amendment Protects A Person's Right To Record Police Officers

Defendants argue that there is no constitutional right to record police officers. Defendants oversimplify First Amendment jurisprudence. Plaintiff submits that Illinois' prohibition of civilian recordings of police officers in public places engaged in their official duties violates the First Amendment's rights to freedom of speech, freedom of the press, and further it impermissibly restricts the right to petition the government for the redress of grievances.

### 1. Freedom of Speech Includes The Right To Record Police Officers

### a. Plaintiff's actions in recording his encounters with police constitutes "speech."

The First Amendment protects the right to "freedom of speech." *U.S. Const., Amdt. I.* Generally, First Amendment protection extends to conduct that is expressive or communicative. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006). In a recent decision, the Supreme Court concluded that "an individual's right to speak is implicated when information he

or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrel v. IMS Health Inc.*, 2011 WL 2472796, at *10 (U.S. June 23, 2011) (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)). The Supreme Court has also held that the First Amendment's protection extends to publication of the content of recorded statements by those not involved in the recording. *See Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (comparing the delivery of a tape recording to the delivery of a pamphlet or handbill and thus finding that the former is the kind of "speech" the First Amendment protects).

In the instant case, Plaintiff's conduct is "expressive" conduct deserving of First Amendment protection. Plaintiff's recording of his police encounters intend to convey a message that his intended audience would almost certainly understand. Specifically, Plaintiff intends to use the recordings to express his dissatisfaction with constant police harassment and misconduct, and to petition the government for relief from such harassment.

**b. The Speech At Issue Here Deserves Special First Amendment Protection**

The First Amendment provides special protection for speech relating to the performance of government and public officials. *See, e.g., Garrison v. Louisiana*, 379 U.S. 64, 77(1964) (recognizing "the paramount public interest in a free flow of information to the people concerning public officials, their servants"); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (refusing to restrict speech on account of the public's interest in the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people"); *See also Bartnicki* 532 U.S. at 539 (Breyer, J., with O'Connor, J., concurring) (allowing the publication of an unlawfully intercepted telephone call, in part because the people recorded were public figures with "a lesser interest in privacy than an individual engaged in purely private affairs"); *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988) (limiting claims brought by public figures, to promote "the free flow of ideas and opinions on matters of public interest"). Police officers are public officials who trigger these special First

18

Amendment protections. *See, e.g., Coursey v. Greater Niles Twp.*, 40 Ill. 2d 257, 265 (Ill. 1968) (a "patrolman" is a "public official" for defamation purposes, because "[t]he abuse of a patrolman's office can have great potentiality for social harm"); *Rotkiewicz v. Sadowsky*, 730 N.E.2d 282, 288-89 & n.5 (Mass. 2000) (same, and collecting cases).

Moreover, the First Amendment provides special protection for speech relating to matters of public concern. *See, e.g., Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) (recognizing that "speech on public issues occupies the highest rung of the hierarchy of First Amendment values")(internal citation omitted); *Bartnicki*, 532 U.S. at 535 (allowing publication of an unlawfully intercepted phone call, in part because it concerned "a matter of public concern"); *Butterworth v. Smith*, 494 U.S. 624, 632 (1990) (striking down a ban on the public disclosure of grand jury testimony because "information relating to alleged governmental misconduct ... has traditionally been recognized as lying at the core of the First Amendment"); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) (recognizing "speech concerning public affairs ... is the essence of self-government" (internal citation omitted); *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 776-77 (1978) (holding that "matters of public concern" are "at the heart of the First Amendment's protection"); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 573 (1968) (recognizing that "free and unhindered debate on matters of public importance" is "the core value" of the First Amendment).

Police activity in publicly accessible areas has been traditionally open to public view. Indeed, there is arguably no location in which First Amendment interests are stronger than on public streets and other open forums. *See Snyder*, 131 S. Ct. at 1218 (Speech "on matters of public concern at a public place adjacent to a public street" is entitled to special First Amendment protection; "[s]uch space occupies a special position in terms of First Amendment protection .... We have repeatedly referred to public streets as the archetype of a traditional public forum, noting that time out of mind public streets and sidewalks have been used for public assembly and debate.").

Plaintiff desires to be able to record on duty police officers engaged in the public performance of their official duties. The manner in which police officers perform their official duties is clearly a matter of public concern. The public has a valid interest in knowing how police officers implement departmental policies, whether they are following the law or abusing their power and the taxpayer's resources.

**2. Freedom of The Press Protects The Right To Record Police Officers**

The First Amendment protects the rights of non-journalists to gather information about matters of public interest.

**a. Freedom Of The Press Includes The Right To Gather Information**

The First Amendment rights to receive and disseminate information have long been recognized. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57(1976) ("[T]he protection afforded is to the communication, to its source and to its recipients both."); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas."); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) ("This freedom embraces the right to distribute literature ... and necessarily protects the right to receive it.").

The constitutional guarantee of freedom of the press begins, however, with the right to gather information. Taken together, the right to gather, disseminate and receive information, are the three links in a chain that ensures a free press; a law that places a burden on a single link burdens free press in its entirety. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980) (plurality opinion). The First Amendment protects the right of a person to gather information on matters of public concern, as a necessary predicate to the subsequent protected exercise of speech, petitioning government, and participation in democratic self-government.

A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance:

> And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.

*Writings of James Madison* 103 (Hunted. 1910), quoted in *Bd. of Educ. v. Pica*, 457 U.S. 853, 867 (1982) (plurality).

Courts have consistently protected the right to gather information. *See, e.g., Richmond Newspapers,* 488 U.S. at 576 ("[f]ree speech carries with it some freedom to listen .... '[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated'" (internal citation omitted)); *Pica,* 457 U.S. at 867 ("the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom.") (emphasis in original); *Pochoda v. Arpaio,* No. CV 08-2254-PHX-NVW, 2009 WL 1407543, at *4 (D. Ariz. 2009) (protecting "observation of [a] demonstration" in a public forum, because the "right to hear" is "no less protected" than "the right to speak," especially where the observer "was there to safeguard or support the civil rights of the demonstrators" (internal citation omitted)); *Goldschmidt v. Coco,* 413 F. Supp. 2d 949, 952-3 (N.D. Ill. 2006) (protecting note-taking in courtrooms, because it allows "courtroom monitors and evaluators of judicial performance representing public interest groups," among others, to "revisit what they have heard or read," and thus to "more fully and accurately evaluate and communicate the subject matter").

### b.  The Right To Gather Information Includes the Right To Record Matters Of Public Interest

The general First Amendment right to gather information includes the more specific right to record matters of public interest.  There can be no doubt that the on-duty activity of law enforcement officers is a matter of public interest. This case involves the gathering of information that could reveal misconduct by law enforcement officers - public officials who serve the community. "It would be difficult to find a matter of greater public concern in a large metropolitan area than police protection and public safety." *Auriemma v. Rice,* 910 F.2d 1449, 1460 (7th Cir. 1990).

And clearly, "[t]he manner in which ... allegations [of police misconduct] are investigated is a matter of significant public interest." *Wiggins v. Burge*, 173 F.R.D. 226, 229 (N.D. Ill. 1997).

Moreover, the right to gather information includes the right to record. The Seventh Circuit has held that the First Amendment right to gather news includes a right to record activities of public interest occurring in public places through photography and audio and video surveillance. See *Dorfman v. Meiszner*, 430 F.2d 558, 562 (7th Cir. 1970) (striking down on First Amendment grounds a ban on photographing and broadcasting in and around Chicago's federal courthouse and office building, including in the center lobby, outdoor plaza and other areas surrounding the building and non-courtroom floors); *Schnell v. City of Chi.*, 407 F.2d 1084, 1085-86 (7th Cir. 1969)(holding that a class of news photographers covering the 1968 Democratic National Convention and attendant demonstrations in Chicago stated a claim for permanent injunction preventing city and police officials from "interfering with [the photographers'] constitutional right to gather and report news, and to photograph news events")(overruled on other grounds).

First Amendment protected recording technologies include photography, audio, and video (often with audio). *Dorfman v. Meiszner*, 430 F.2d at 561-62; *Schnell*, 407 F.2d at 1086; *Connell v. Town of Hudson*, 733 F. Supp. 465 (D.N.H. 1990); *Blackston v. State of Ala.*, 30 F.3d 117, 119-20 (11th Cir. 1994); *Thompson v. City of Clio*, 765 F. Supp. 1066 (M.D. Ala. 1991); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Cuviello v. City of Oakland*, 2007 WL 2349325, at *3 (N.D. Cal. Aug. 15, 2007); *Davis v. Stratton*, 575 F. Supp. 2d 410, 421 (N.D.N.Y. 2008), rev'd on other grounds, 360 Fed. Appx. 182 (2d Cir. 2010); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005); *Lambert v. Polk Cnty.*, 723 F.Supp. 128 (S.D. Iowa 1989); *Channel 10, Inc. v. Gunnarson*, 337 F.Supp. 634, 638 (D. Minn. 1972).

Protected subjects of these recordings include recordings of on-duty police and civilians in public places and forums. *Fordyce*, 55 F.3d at 438-39 (video of police); *Schnell*, 407 F.2d at 1086

22

(photos of police); *Smith*, 212 F.3d at 1333 (photos and video of police); *Robinson*, 378 F. Supp.2d at 534 (video of police); *Channel 10, Inc.,* 337 F. Supp. at 638 (video of an arrest); *See also Williamson v. Mills*, 65 F.3d 155 (11th Cir. 1995) (police violated the Fourth Amendment by arresting a person for photographing police); and *Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir. 1999) (police violated the Fourth Amendment by arresting person for audio recording government meeting).

The right to record includes recording the conduct of on-duty police officers engaged in their official duties. *See, e.g., Smith*, 212 F.3d at 1333 (finding a right to "photograph or videotape police conduct" because "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest"); *Fordyce*, 55 F.3d at 439 (finding a right "to film matters of public interest," including police activity at a political rally); *Dorfman*, 430 F.2d at 562 (finding a right to take audio, video, and photos of demonstrations outside the Dirksen Courthouse); *Schnell*, 407 F.2d at 1085 (finding a right to photograph police at the 1968 Democratic National Convention); *Robinson*, 378 F. Supp. 2d at 541 (finding a right to film police, because "[t]he activities of the police, like those of other public officials, are subject to public scrutiny," including "the unsafe manner in which they were performing their duties"); *Demarest v. Athol/Orange Cnty. Television, Inc.*, 188 F. Supp. 2d 82, 94 (D. Mass. 2002) (finding a right to make audio and video recordings of "matters of public interest"); *See also Jean v. Massachusetts State Police*, 492 F.3d 24, 30 (1st Cir. 2007) (protecting activist's broadcast of homeowner's unlawful audio recording of police search, because "the event depicted on the recording- a warrantless and potentially unlawful search of a private residence- is a matter of public concern").

### c.  The Right to Gather Information Extends to Non-Journalists

The right to gather news extends to all people who disseminate information to the public. Nontraditional information gatherers have played an important role in informing the public

throughout this nation's history, from revealing unsanitary and inhumane conditions in the meat packing industry in the early 20th century, to exposing the health hazards of tobacco, to shaping public opinion about the Vietnam War. Increasingly, modern technology has given citizens the ability to capture news using inexpensive digital cameras or cell phones and to publish their findings on the Internet. Thus, individuals protected by the First Amendment have not only included traditional journalists, but also private public interest groups, and individual citizens. *Dorfman*, 430 F.2d at 560; *Schnell*, 407 F.2d at 1085; *Connell*, 733 F. Supp. at 466; *Channel 10, Inc.,* 337 F. Supp. at 635; *Cuviello*, 2007 WL 2349325, at *3; *Fordyce*, 55 F.3d at 438-39; *Blackston*, 30 F.3d at 119; *Davis*, 575 F. Supp. 2d at421; *Robinson*, 378 F. Supp. 2d at 538-40; *Lambert*, 723 F. Supp. at 130.

In a world of emergent technologies, individuals' recordings have become fundamental to newsgathering. Today, freedom of speech and petition are strongly linked with new, evolving, and commonly used communications technologies that gather and record events as they occur. The audio and video recording capabilities of smart phones and similar hand-held devices, and the ease by which these recordings can be uploaded to the internet are changing the way the public gets its news. Non-journalists use readily available technology to gather and record information occurring in public places and forums, including conversations. People then share their recordings with others, often immediately. These recordings are more accurate and credible than memory or note-taking. Recording public events has long facilitated speech and petition on matters of public concern. But today, the participants in a social movement can use their own phones to record and disseminate the transformative images and sounds, without relying on the traditional media. The advancement of technology demands a new definition of "journalism." The First Amendment right to gather information must protect all people, whether journalists or not.

### 3. The Right to Petition the Government to Redress Grievances Includes The Right To Record Police Officers

The First Amendment also protects "the right of the people…to petition the Government for a redress of grievances." *U.S. Const., Amdmt. I.* Litigation is one constitutionally protected way in which individuals may petition the government for redress of grievances, because a court is the forum in which legal rights are vindicated. *Chen v. Holder*, 607 F.3d 511, 513 (7th Cir. 2010). Therefore, the Supreme Court has firmly established that the First Amendment also protects, as an aspect of the right to petition, an individual's right to access to the courts. *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 896-97 (1984); *see also BE & K Cont. Co. v. N.L.R.B.*, 536 U.S. 516, 517 (2002) ("The right to petition is one of the most precious liberties safeguarded by the Bill of Rights."). A state actor's efforts to impede an individual's access to the courts may give rise to a constitutional claim against the state actor. *Harrell v. Cook*, 169 F.3d 428, 432 (7th Cir. 1999). For example, when police officers conceal or obscure important facts about a crime from its victims, rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged. *Id.*; *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995) (citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984)).

Here, Plaintiff has alleged that the specific reason he purchased the video camera was so that he could record his interactions with police and use that recording to defend himself in court and/or use the recording to seek judicial intervention into his continued harassment by police. Without the ability to record his frequent interactions with police, Plaintiff is forced to engage in a credibility contest with police officers – a contest often skewed in the officers' favor. Because the Act prohibits him from collecting this evidence, it violates his right to petition the government for redress of grievances.

### C. Illinois Eavesdropping Statute Violates the First Amendment

#### 1. The Act is Subject To Strict, Rather Than Mid-Level, Scrutiny

The Act as applied to Plaintiff's desire to record his interactions with the police comprises speaker-based and content-based discrimination, and each triggers strict scrutiny.

### a. Speaker-based discrimination.

The Act discriminates among speakers. It allows uniformed police officers, at their discretion and without court approval, to make virtually any audio recording of their conversations with civilians, while forbidding civilians from recording of those same conversations. This violates both the Free Speech Clause and the Equal Protection Clause. *Police Dep. Of City of Chi. v. Mosley* , 408 U.S. 92, 95 (1972) ("the equal protection claim in this case is closely intertwined with First Amendment interests"). "Speech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 130 S. Ct. 876, 899 (2010); *see also Rosenberger v. Univ. of Virginia*, 515 U.S. 819, 828 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another."); *Bellotti*, 435 U.S. at 784-85 ("the legislature is constitutionally disqualified from dictating ... the speakers who may address a public issue"). "[S]peaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner Broad., Inc. v. FCC*, 512 U.S. 622, 658 (1994).

Moreover, the Act on its face does not limit the discretion of officers to decide which conversations to record, at what point to start and stop recording, and which recordings of conversations to save or destroy, or to withhold or disclose. If a conversation casts an officer in a positive light, the officer may record it, and save and disclose the recording. But if a conversation casts an officer in a negative light, the officer may choose not to record it, or to destroy or withhold the recording.

Thus, police exclusively control whether such recordings are heard by the public. The speaker-based discrimination patent in the Act thereby creates a danger of viewpoint discrimination: police but not civilians may make, save, and use audio recordings to advance their views of what occurred during contested incidents.

### b. Content based discrimination.

The Act also discriminates based on content. It punishes civilians who record police four to five times more severely than civilians who record other civilians(four to fifteen years in prison versus one to three years). Thus, prosecutors making charging decisions under the Act must consider the content of the recording, i.e., whether the recording includes the voices of police as opposed to civilians. Content discrimination also triggers strict scrutiny. *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 646 (7th Cir. 2006); *Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005).

### c. Mid-Level Scrutiny Is Not Applicable

First Amendment mid-level scrutiny for "time, place, and manner" regulations of speech in a public forum, or for conduct regulations of general applicability that incidentally burden speech, is not sufficiently protective where (as here) government discriminates based on speaker and content. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (forum regulations must be "justified without reference to the content" of speech); *United States v. O'Brien*, 391 U.S. 367, 377 (1968) (conduct regulations must be "unrelated to the suppression of free expression"); *see also Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2723-24 (2010) (applying a test stricter than *O'Brien* when government "regulates speech on the basis of its content"); *Texas v. Johnson*, 491 U.S. 397, 403 (1989) ("a more demanding standard" than *O'Brien* applies if "the State's regulation is related to the suppression of free expression").

Moreover, the Act as applied to the facts of this case, is not a conduct regulation that incidentally burdens speech. *O'Brien*, 391 U.S. 367. Instead, it directly bans an expressive activity: openly recording spoken words in the absence of a reasonable expectation of privacy, and in particular the words of on-duty police in public places. Such recording ordinarily is done (as here) to obtain accurate information to share with others. *See, e.g., BSA v. Dale*, 530 U.S. 640, 659 (2000)

27

(applying a test stricter than *O'Brien* where statute "directly and immediately" burdened association); *Buckley v. Valeo*, 424 U.S. 1, 16 (1976)(applying a test stricter than O'Brien because "[s]ome forms of communication made possible by the giving and spending of money involve speech alone"). Indeed, recording information with modern technologies and publishing that information are both necessary links in a unitary chain of expression. It would be erroneous to break off the first link (recording public officials) and treat it as unprotected conduct, as opposed to fully protected expression. *See Citizens United*, 130 S. Ct. at 896-97 ("Laws enacted to control or suppress speech may operate at different points in the speech process.").

### 2. The Eavesdropping Act, As Applied, Cannot Withstand Strict Scrutiny

First Amendment strict judicial scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 130 S. Ct. at 898. Under strict scrutiny, a speech restriction is not narrowly tailored if "a less restrictive alternative would serve the Government's purpose." *Entm't Software Ass'n*, 469 F.3d at 646.

Defendants cannot meet their burden of showing that the application of the Act to Plaintiff is narrowly tailored any legitimate governmental interest. Defendants have not provided this court with any compelling governmental interest justifying a restriction on speech. Defendant Waller has failed to provide this Court with any governmental interest in prohibiting the recording of non-private on duty police officer conversations and Defendant Madigan vaguely refers to the "inherently dangerous" nature of traffic stops, and the potential embarrassment of police officers if their conversations are made public. *Def. Madigan Mem., pp. 10-11*. Neither governmental interest compelling, or even presents any logical support for the ban.

Moreover, any the governmental interest in protecting the privacy of private conversations also does not justify the application of the Act as applied. When on-duty police in public places speak in a manner that can be heard by passersby, they have no reasonable expectation of privacy.

28

Neither do civilians who speak to police in these circumstances. Therefore, Defendants cannot show that the Act is narrowly tailored to any compelling governmental interest and the act fails strict scrutiny.

### 3. The Eavesdropping Act, As Applied, Cannot Withstand Mid-Level Scrutiny

Defendants argue that Illinois' Eavesdropping Act does not trigger heightened First Amendment Scrutiny. *Def. Waller Mem.,* p. 6-7; *Def. Madigan Mem.*, p. 11. Even if mid-level scrutiny were the proper standard, the Eavesdropping Act cannot satisfy it. Mid-level scrutiny also requires that the Act's prohibition of Plaintiff's recordings of police officers be narrowly tailored to a significant governmental interest. It is not, and moreover, the Act as applied fails to leave open ample alternative channels of communication.

### a. Illinois Eavesdropping Act Fails The Narrow Tailoring Test.

Under the mid-level test for conduct regulations, a regulation passes muster only if "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of' the government's interest. *O'Brien*, 391 U.S. at 377. Likewise, under the mid-level test for "time, place, and manner" regulations of speech in public forums, a regulation must be "narrowly tailored to serve a significant governmental interest." *Ward*, 491 U.S. at 791. These two mid-level First Amendment tests (*O'Brien* and *Ward*) "embody the same standards." *Hodgkins v. Peterson*, 355 F.3d 1048, 1057 (7th Cir. 2004). Under either formulation, government bears the burden of proof. *Heffron v. ISKCON*, 452 U.S. 640, 658 (1981); *Chicago Cable Comm'ns v. Chicago Cable Comm'n*, 879 F.2d 1540, 1548 (7th Cir. 1989). Mid-level narrow tailoring requires the government to prove that its speech restraint is "not substantially broader than necessary to achieve the government's interest." *Ward*, 491 U.S. at 799. Further, government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad.*, 512 U.S. at 17.

Here, there is no merit in any argument that the Plaintiff's recording of his interactions with local police would somehow diminish effective law enforcement, as Defendant Madigan seems to argue. In fact, it may advance this interest. The government on mid-level review "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad.*, 512 U.S. at 664. There is no basis in logic or experience to conclude that the Plaintiff's recording of his encounters with on-duty police officers would chill, discourage, or distract police officers from lawfully performing their duties. The addition of audio recording would simply improve the accuracy and reliability of later reports of these encounters.

Ultimately, Illinois' Eavesdropping Act allows recording of virtually all conversations between civilians and uniformed police, so long as police do the recording. There is no basis in logic or experience to conclude that police recording civilians will not undermine privacy, but civilians recording police will. In addition, there is there is no merit in Defendants' cursory argument that Plaintiff's recording of police would somehow diminish effective law enforcement. Thus, the Act is not narrowly tailored and cannot withstand mid-level constitutional scrutiny.

### b. The Eavesdropping Act, As Applied, Also Fails the Alternative Channels Test

A "time, place, or manner" regulation must also "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (internal citation omitted). Here, the issue is alternative channels of information gathering. An audio recording of police-civilian encounters often will provide critical evidence not available from other sources, including testimony, notes, photos, and silent video. Government cannot command a documentary filmmaker to stop making a film on the grounds that she is free to write a book instead. *See generally Virginia State Bd. Of Pharmacy*, 425 U.S. at 757 n.15 (government cannot restrain speech on the assertion that "the speaker's listeners could come by his message by some other means"). Without the ability to make a

30

recording of his interaction with police officers, Plaintiff is forced to engage in a credibility contest with police officers- a contest skewed in the police officers' favor.

### E. Judge Conlon's Decision In *ACLU vs. Alvarez* is neither controlling nor correctly decided.

The U.S. District Court concluded in *ACLU v. Alvarez* that the ACLU had not alleged a cognizable First Amendment injury because "there is nothing in the Constitution which guarantees the right to record a public event." *ACLU v. Alvarez*, No. 10 C 5235, 2011 WL 66030, at *3 (N.D. Ill. Jan. 10, 2011). The court based this conclusion in part, however, on a misreading of *Potts v. City of Lafayette, Ind.*, which upheld as narrowly tailored prohibition on bringing into a KKK rally items that could be used as weapons, including tape recorders. *Potts v. City of Lafayette, Ind.*, 121 F.3d 1106, 1111 (7th Cir. 1997). There, the government sought to stop tape recorders from being used as weapons-a legitimate concern, because "personal items, such as a reporter's tape recorder, had been used to injure attendees" at prior KKK rallies. *Id.* at 1109. But here, government seeks to stop tape recorders from being used as tape recorders- an activity that poses no public safety hazard.  Indeed, in applying the mid-level "time, place, or manner" test, the *Potts* court necessarily concluded that the First Amendment protects audio recording of public events. *Id.* at 1111-12.  The *Potts* decision addressed the use of tape recorders as weapons, not as a means to exercise a constitutional right.

The District Court in the *ACLU* case also opined that police officers are not "willing speakers" and thus the ACLU had no First Amendment right to audio record them. *Alvarez*, 2011 WL 66030, at *4. This misinterprets controlling precedent. While there is no right to receive information from a person who chooses not to speak, *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007); *Bond v. Utreras*, 585 F.3d 1061, 1078 (7th Cir. 2009), there is a right to openly gather information from on-duty police who, while performing their duties in public places, speak in a volume that can be heard by others.  Police may not stop civilians from listening and taking notes; since they are public officials and there is no reasonable expectation of privacy, whether they want

the civilian to listen and take notes or not. *See Richmond Newspapers,* 448 U.S. at 578. To prohibit citizens from recording these same spoken words with an electronic device which they could have recorded with a pen and a piece of paper is illogical and does not create a "willing speaker" requirement where one does not exist for a listener with a pen and paper. Illinois allows uniformed police to audio record civilians in these circumstances, whether or not the civilians consent to recording. There is no constitutional basis to allow police to record these non-private conversations, while banning civilians from doing so.

## IV. Defendants Are Not Entitled To A Dismissal Of Plaintiff's Fourth Amendment Claims.

Essentially, Defendants argue that Plaintiff's Fourth Amendment claims[6] must be dismissed because probable cause existed to arrest him for violation of the Eavesdropping statute. First, probable cause is not an issue appropriately resolved by a 12(b)(6) motion, since it is a factual issue that ultimately should be decided by a jury. Second, any probable cause to arrest Plaintiff was extinguished when the Assistant State's Attorney did not approve charges against Plaintiff for any offense, and thus, the continued detention and subsequent charging of Plaintiff for a separate and distinct felony offense must be supported by separate probable cause. Finally, Defendants lacked probable cause to arrest Plaintiff for a violation of the Eavesdropping statute because a person of reasonable prudence would know that arresting Plaintiff for recording an encounter with the police while the police simultaneously recorded the same conversation, would be grossly and flagrantly unconstitutional.

### A. The Probable Cause Issue Should Not Be Decided At This Stage Of The Proceedings

The Lindenhurst Defendants ask this Court to find, on the basis of Plaintiff's complaint alone,

---

[6] Defendants assert that "probable cause is the common denominator" to Plaintiff's False Arrest, Conspiracy, Policy and malicious prosecution claims. (Lindenhurst Defendants' Mem. p. 3) Defendants have been both under and over inclusive in this list. Plaintiff submits that the probable cause issue also relates to the unlawful search claim, but it is only partially determinative of his Policy claim, since that claim is also based on the First, and not just the Fourth, Amendment violation.

that probable cause existed to arrest Plaintiff, and thus, that his Fourth Amendment claims should

be dismissed. However, determining whether probable cause existed is not always appropriate for

judicial resolution: the determination "must be made by a jury if there is room for a difference of

opinion concerning the facts or the reasonable inferences drawn from them." *Wheeler v. Lawson*, 539

F.3d 629, 634 (7th Cir. 2008) (internal quotation marks and citations omitted); *see also Booker v. Ward*,

94 F.3d 1052, 1058 (7th Cir.1996). Only if the facts upon which the probable cause determination by

police was made are undisputed, the Court may decide the issue. *Ward*, 94 F.3d at 1058; *Maxwell v.*

*City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). In this case, the facts surrounding the issue of

probable cause will be hotly disputed, and are not appropriately decided in the context of a motion

to dismiss.

### B. Probable Cause Expired When The State's Attorney Declined Charges

The parties have not even yet begun discovery, however, Plaintiff has alleged that when the

State's Attorney did not approve Eavesdropping charges against Plaintiff, Defendants then

conspired together to fabricate another separate, distinct and totally unrelated charge against Plaintiff

in order to justify his continued detention. *Compl.* ¶¶ 38-40. Once the Defendants could not charge

Plaintiff with the Eavesdropping offense, Defendant Officers needed separate and distinct probable

cause to continue to detain and charge him. *See e.g.*, *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986)

(citation omitted) ("The continuation of even a lawful arrest violates the Fourth Amendment when

the police discover additional facts dissipating their earlier probable cause."). Neither does the

Supreme Court's decision in *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), provide justification for

their continued detention of Plaintiff on the narcotics charge. A detention for a second offense is

justified if the officers had probable cause to arrest the suspect either for the precise offense the

officers cited or for a closely related offense only. *See Richardson v. Bonds*, 860 F.2d 1427 (7th Cir.

1988). The justification for the arrest cannot be an "ex post facto extrapolation of all crimes that

33

might have been charged on a given set of facts." *Id.* at 1431.

Once the State's Attorney failed to approve probable cause to charge Plaintiff under the Eavesdropping Act, Defendants had no further probable cause to continue to detain Plaintiff for that offense. Defendants themselves, were aware of this, which is why they began to brainstorm about what other charges they might place against Plaintiff. Probable cause to continue to detain Plaintiff on a felony drug possession charge, and to charge him with this offense is a matter that will be hotly contested by the parties. Plaintiff contends his paper prescriptions were with his medications and that Defendants knew this, and Defendants, of course, are expected to deny any such knowledge. The determination of this issue will be for a jury, and is not appropriately determined on a motion to dismiss.

### C. Probable Cause Cannot Exist Where The Statute is Grossly Unconstitutional

Finally, to the average person, Plaintiff's arrest for recording a police officer while the police officer was recording him, seems absurd. While police officers are not "required to anticipate that a court [will] later hold the ordinance unconstitutional," in cases in which a law is "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws," probable cause to arrest for a violation of that statute may not exist. *See Michigan v. DeFillippo,* 443 U.S. 31, 38 (1979). In rare instances, an officer is required to factor in the probable unconstitutionality of a statute before making an arrest pursuant to that statute. In determining whether this is such an instance, the Seventh Circuit has indicated the presence of other litigation concerning the statute may be helpful. *See Doe v. Heck,* 327 F.3d 492, 516 (7th Cir. 2003).

In this state, the Illinois' Eavesdropping statute has been the subject of multiple constitutional challenges in both state and federal courts[7] and of course, the constitutionality of the

---

[7] *See People v. Drew,* No. 10-CR-4601 (Cook County Cir., charges filed Dec. 15, 2009); *People v. Moore,* No. 10-CR-15709 (Cook County Cir., charges filed Aug. 31, 2010); *People v. Thompson,* No. 04-CF-1609 (6th Cir., Champaign Co., 2004); *People v. Wight,* No. 05-CF-2454 (17th Cir., Winnebago Co., 2005); *People v. Babarskas,*

Eavesdropping statute has been directly challenged in this District by the ACLU in a case currently pending before the Seventh Circuit. *ACLU v. Alvarez*, 2010 WL 4386868 (N.D. Ill. Oct. 28, 2010), *appeal filed*, (7th Cir. April 15, 2011). The Act has also been the subject of increasing media coverage. *For e.g,* Larry McDonald, *THIS IS THE POLICE. DROP THE CAMERA: Illinois' Eavesdropping Law Turns Smart-Phone Owners Into Felons*, River Cities' Reader (Davenport, Iowa) (June 9, 2011) (available at http://rcreader.com/news/this-is-the-police-drop-the-camera/); Jason Mick, DailyTech Blog, *Chicago Police: Tape Us, Get Sentenced to 15 Years in Prison*, http://www.dailytech.com/Chicago+Police+Tape+Us+Get+Sentenced+to+15+Years+in+Prison /article20735.htm (Jan. 24, 2011 2:25 p.m. CT); Don Terry, *Eavesdropping Laws Mean That Turning On an Audio Recorder Could Send You to Prison*, NY Times (Jan. 22, 2011) (available at http://www.nytimes.com/2011/01/23/us/23cnceavesdropping.html?pagewanted=all); Becky Schilkerman and Kristen Mack, *ACLU Challenges Illinois Eavesdropping Act*, Chicago Tribune (Aug. 19, 2010) (available at http://articles.chicagotribune.com/2010-08-19/news/ct-met-aclu-privacy-lawsuit-20100819_1_police-officers-police-activity-aclu); AUTHOR?, *A First Amendment right to audiorecord police?*, 98 Ill. B.J. 505 (Oct. 2010); Radley Balko, *The War on Cameras*, Reason Magazine (Jan. 2011) (available at http://reason.com/archives/2010/12/07/the-war-on-cameras); Terrence O'Brien, *Record a Police Officer in Illinois, Get 15 Years in Prison*, Switched.com (Jan. 24, 2011) (available at http://www.switched.com/2011/01/24/record-a-police-officer-in-illinois-get-15-years-in-prison/).

   In the instant case, Defendant Goar knew that he was simultaneously engaging in the exact same conduct for which he was arresting Plaintiff (recording their conversation without Plaintiff's knowledge or consent). Most people of reasonable prudence would not only doubt the existence of

---

No. 06-CF-537, (12th. Cir., Will Co., 2006); *People v. Lee*, No. 08-CF-1791 (12th. Cir., Will Co., 2008); *People v. Allison*, No. 09-CF-50 (2nd Cir., Crawford Co., 2009); *People v. Parteet*, No. 10-CF-49 (16th Cir., Dekalb Co., 2010); *People v. Biddle*, No. 10-CF-421 (16th Cir., Kane Co., 2010); *People v. Fitzpatrick*, No. 10-CF-397 (5th Cir., Vermillion Co., 2010); and *People v. Gordan*, No. 10-CF-341 (11th Cir., Livingston Co., 2010).

probable cause to arrest in this situation, but would find any law that allowed such an arrest to be manifestly unfair and irrational. The existence of multiple challenges to the statute's constitutionality, compounded by the absurdity of its enforcement in this case, creates just such a rare instance where a statute fails to provide probable cause.  Thus, the fact that Plaintiff may have violated the Illinois Eavesdropping statute does not provide reason to dismiss his Fourth Amendment claims.

## **CONCLUSION**

Plaintiff respectfully requests that this court deny Defendants' motions to dismiss in their entirety.  In the alternative, if this Court finds Plaintiff's Complaint deficient in any respect, Plaintiff requests leave to amend his complaint to cure any such deficiencies.

Respectfully submitted,

/s Torreya L. Hamilton
Attorney for Plaintiff

/s Thomas P. Needham
Attorney for Plaintiff

HAMILTON LAW OFFICE, LLC
11 South LaSalle St., Suite 1000
Chicago, IL 60603
312.726.3173
Attorney No.: 6229397

LAW OFFICE OF THOMAS P. NEEDHAM
11 South LaSalle Street, Suite 1000
Chicago, IL 60603
773.726.3171
Attorney No. 6188722