UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOUIS FROBE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 C 1722 |
| | ) | |
| The VILLAGE OF LINDENHURST, a | ) | Judge Rebecca R. Pallmeyer |
| municipal corporation, Lindenhurst | ) | |
| Police officers RALPH H. GOAR, | ) | |
| JOHN E. MARS, and JOHN F. FISHER, | ) | |
| Lake County State's Attorney | ) | |
| MICHAEL J. WALLER, and Illinois | ) | |
| Attorney General LISA MADIGAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Louis Frobe wants to audio-record his future encounters with police officers while those officers perform official duties in public places. The Illinois Eavesdropping Act, 720 ILCS 5/14 (hereinafter, "IEA"), makes such audio recordings illegal, however. On March 11, 2011, Plaintiff brought this suit against Lake County State's Attorney Michael J. Waller ("State's Attorney"), Attorney General Lisa Madigan ("Attorney General"), the Village of Lindenhurst and police officers Ralph H. Goar, John E. Mars, and John H. Fisher (collectively, "Lindenhurst Defendants"). Plaintiff alleges that he has a reasonable fear of arrest and possible prosecution under the IEA. In Count I of his complaint, Plaintiff seeks a declaratory judgment that the IEA is unconstitutional as applied to him and an injunction that bars Defendants from arresting or prosecuting him for such audio recordings. In Counts II through VI, Frobe brings false arrest, unlawful search, conspiracy, and malicious prosecution claims against the Lindenhurst Defendants for an incident in August 2010.

During the time this case has been pending, several courts have considered challenges to the IEA. On May 8, 2012, in *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir.

2012), the Seventh Circuit stated that as applied to facts similar to Plaintiff's, the IEA "likely violates" the First Amendment. Further, in three separate cases, Illinois state court judges have held the IEA unconstitutional as applied. Then in *Alvarez*, the district court, on remand, held the statute unconstitutional as applied. *Am. Civil Liberties Union of Illinois v. Alvarez*, No. 10 C 5235, 2013 WL 6680341 (N.D. Ill. Dec. 18, 2012) (Coleman, J.) Although Defendants initially argued that the IEA as applied does not violate the Constitution, they have abandoned that position. Both the State's Attorney and the Attorney General, each an elected official, have now declared publicly that they will not prosecute Plaintiff nor advise his arrest under similar circumstances.

Attorney General Madigan and State's Attorney Waller argue that, given these events, Plaintiff no longer has a reasonable fear of arrest or prosecution. Pursuant to FED. R. CIV. P. 12(b)(1), Madigan and Waller move for dismissal of Count I of Plaintiff's complaint as moot. Plaintiff contends, however, that the continued existence of the IEA statute, its prior widespread enforcement, Defendants' initial defense of the statute, and the discretion and limited tenure inherent in the positions of State's Attorney and Attorney General, together preserve Plaintiff's reasonable fear of arrest under the IEA. For the reasons explained below, this court grants Defendants' motions to dismiss Count I as moot.

## FACTUAL BACKGROUND

### I. The Complaint

For purposes of these motions, the court presumes that Plaintiff's allegations are true. Plaintiff Louis Frobe and his wife own a home in Lake Villa, Illinois. (Compl. [1] ¶ 19). Chronic pain and associated prescribed medications cause Plaintiff to have trouble sleeping. (Compl. ¶ 17). When he cannot sleep at night, Frobe often passes the time by going to the movies or by heading outdoors to watch nocturnal animals. (Compl. ¶ 17.) Watching nocturnal animals requires Plaintiff to be out at night by himself; Plaintiff alleges this has led to frequent, and often unpleasant,

2

encounters with local police. (Compl. ¶ 18.) Plaintiff estimates that in the time he has lived in Lake Villa, local police and have stopped and questioned him forty times. (Compl. ¶ 19.)

On one such occasion in April 2010, Plaintiff was in the woods at night when local police officers stopped him. (Compl. ¶ 20.) Suspicious of his statement that he was out observing animals, police interrogated Frobe and searched his vehicle. (Compl. ¶ 20.) They found an unlabeled bottle of pills and charged Plaintiff with possession of a controlled substance. (Compl. ¶ 20.) When Plaintiff presented a copy of his prescription for the medication in court, police dismissed the charges. (Compl. ¶ 20.) In response to this encounter and others, Plaintiff purchased a video camera, intending to use it to record encounters with police as protection against unlawful arrest and other unconstitutional conduct. (Compl. ¶ 26.)

On August 15, 2010, Plaintiff was driving to a late movie when Defendant Lindenhurst Officer Goar pulled him over. (Compl. ¶¶ 21, 23.) Defendant Goar approached Plaintiff's car and explained that he curbed Frobe for speeding. (Compl. ¶ 25.) When Officer Goar returned to his squad car with Plaintiff's driver's license, Frobe began recording with his video camera. (Compl. ¶ 27.) Officer Goar returned to Plaintiff's car and engaged Plaintiff in conversation; during that conversation, he discovered that Plaintiff was recording, and arrested Plaintiff for the felony offense of eavesdropping. (Compl. ¶ 29-31.)

Under the language of the IEA, a person eavesdrops when he or she knowingly and intentionally audio-records "all or any part of any conversation" without consent. 720 ILCS 5/14-2(a)(1). The IEA makes it a Class 1 felony to eavesdrop on a conversation with a police officer "while in the performance of his or her duties." 720 ILCS 5/14-4(b). Although the Lake County Prosecutor's Office never filed eavesdropping charges (Compl. ¶ 39), Plaintiff spent the night in jail on a charge related to his prescription medications, a charge later dismissed by the Lake County State's Attorney. (Compl. ¶¶ 40-45.)

On March 11, 2011, Plaintiff filed this lawsuit, alleging that he wishes to audio- and video-

record his frequent encounters with on-duty police officers while they perform their official duties in public places. (Compl. ¶ 47.) Plaintiff believes that recording his encounters will deter and detect police misconduct that violates his constitutional rights. (Compl. ¶ 48.) In addition, he seeks to use any such recordings as evidence to defend himself against false criminal charges, to petition for redress of grievances, or both. (Compl. ¶ 48.) Plaintiff fears, however, that any future attempts to audio record his encounters with police will result in his arrest and perhaps prosecution. (Compl. ¶ 49.) Plaintiff's complaint identifies, as the bases for his fear of arrest and prosecution, the IEA statute (Compl. ¶ 51), his own prior arrest (Compl. ¶ 49), and various arrests and "criminal prosecutions [then] currently proceeding" against other citizens for IEA violations under circumstances similar to Plaintiff's. (Compl. ¶ 46, 51.)

In Count I, Plaintiff seeks a declaratory judgment holding that the IEA violates the First Amendment, U.S. CONST. amend. I, as applied to the audio recording of police officers without their consent, "when (a) the officers are performing their public duties, (b) the officers are in public places, (c) the officers are speaking at a volume audible to the unassisted human ear, and (d) the manner of recording is otherwise lawful . . . ." (Compl. at 11.) Also in Count I, Plaintiff requests that this court enjoin Defendants from arresting or prosecuting Plaintiff under the IEA for recording police officers under the above circumstances. (*Id.*)

## II. Subsequent Events

On May 12, 2011, Defendants filed their initial separate motions to dismiss pursuant to FED. R. CIV. P. 12(b); Defendants argued that the IEA did not violate the First Amendment, and that Plaintiff's complaint failed to state a claim for relief. (State's Att'y. Mot. [33] at 6; Att'y Gen Mot. [29] at 2; Lindenhurst Mot. [31] at 9.) This court stayed the case [47] pending the disposition of the Seventh Circuit appeal in the *Am. Civil Liberties Union of Illinois v. Alvarez* litigation.

In *Alvarez*, plaintiff ACLU alleged, as Frobe does here, that the First Amendment permits

4

a citizen to record police officers without their consent when "(1) the officers are performing their public duties; (2) the officers are in public places; (3) the officers are speaking at a volume audible to the unassisted human ear; and (4) the manner of recording is otherwise lawful." 679 F.3d at 588 (internal quotation omitted). In its May 8, 2012 opinion remanding this case, the Seventh Circuit stated in that the IEA, as applied to the audio recording of police officers described above, is "likely unconstitutional", and instructed the district court to enjoin a state's attorney from prosecuting the ACLU under the IEA. *Id*. at 586-87, 608. On remand, the district court did hold the IEA unconstitutional as applied. *Alvarez*, No. 10-C-5235, 2012 WL 6680341, at *3 (N.D. Ill. Dec. 18, 2012). In addition, three state courts held the law unconstitutional as applied to circumstances similar to those here. *People v. Allison*, No. 2009-CF-50 (Crawford County); *People v. Drew*, No. 10-CR-0046 (Cook County); *People v. Melongo*, No. 10-CR-8092 (Cook County). The Attorney General, who filed a brief supporting the constitutionality of the IEA in *Allison*, later moved to dismiss its appeal from the state court's ruling. (Att'y Gen. Reply [106] at 2). Defendants have formally withdrawn all arguments defending the statute as constitutional.

The Attorney General has formally and publicly represented that "the Attorney General will not prosecute or assist in prosecuting Frobe under the [IEA], because any prosecution of Frobe under the facts in his complaint would run afoul of the First Amendment." (Att'y Gen. Mem. [72] at 1.) Similarly, "the State's Attorney has adopted a formal policy, due to the Seventh Circuit's opinion in [*Alvarez*], to not prosecute individuals under the circumstances that Plaintiff alleges." (State's Att'y Mem. [70] at 1.) A newly elected State's Attorney has continued this non-prosecution policy. (Ex. A to State's Att'y Reply [105].) And the State's Attorney's policy of non-enforcement under the instant circumstances has been communicated, in writing, to the Lake County law enforcement community. (Ex. B to State's Att'y Reply [105].)

5

**DISCUSSION**

Pursuant to FED. R. CIV. P. 12(b)(1), Defendants move for dismissal of Count I against them as moot. "The doctrine of mootness stems from Article III of the Constitution, which limits the jurisdiction of federal courts to live cases or controversies." *Damasco v. Clearwire Corp.*, 662 F.3d 891, 894 (7th Cir. 2011) (citing *Spencer v. Kemna,* 523 U.S. 1, 7 (1998)). "Mootness is often described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 491 (7th Cir. 2004) (quoting *Arizonans for Official English v. Arizona,* 520 U.S. 43, 68 n. 22 (1997)). "The party asserting mootness bears the burden of persuasion." *Wis. Right to Life*, 366 F.3d. at 491 (citing *Friends of the Earth v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 189 (2000)).

Defendants have declared that they will not enforce the IEA as applied against Plaintiff because it is unconstitutional. They argue the case is therefore moot. Plaintiff finds this declaration unsatisfying. He urges the court "to consider the context in which these assurances have been made . . . and what weight they are entitled to." (Pl.'s Reply [89] at 11.) In other words, Plaintiff suggests that this court must evaluate whether Defendants' promise not to enforce is "genuine." (Pl.'s Reply at 11.)

Indeed, "[i]t is well established that a defendant's voluntary cessation of a challenged practice does not necessarily moot a case." *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009). "'[T]he mere cessation of the conduct sought to be enjoined does not moot a suit to enjoin the conduct, lest dismissal of the suit leave the defendant free to resume the conduct the next day.'" *ADT Security Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854, 864 (7th Cir. 2013) (quoting *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 947 (7th Cir. 2006)). Because a "mere cessation" is not enough to moot a claim, Plaintiff is correct that, in order to

6

assess whether his challenge is moot, this court must look to the context of Defendants' promises not to enforce the statute as applied.

When a defendant has voluntarily ceased engaging in challenged conduct and promised not to resume it, those promises render the case moot "if there is no reasonable expectation that the wrong will be repeated." *ADT Security Servs.*, 724 F.3d at 864 (citing *Chicago United Indus.*, 445 F.3d at 947-49). Generally, "the court must decide whether the complained-of conduct may be resumed." *Nelson*, 570 F.3d at 882 (citing *Vincent v. City Colleges of Chicago,* 485 F.3d 919, 925 (7th Cir.2007)). "A court's power to grant injunctive relief only survives if such relief is actually needed. 'The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility.'" *Nelson*, 570 F.3d at 882 (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953)). If the court determines that Plaintiff's claim for injunctive relief is moot, he may nevertheless seek declaratory relief, but only as a predicate to an award of damages–relief not sought against the Attorney General or the State's Attorney.

In *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485 (7th Cir. 2004), the Seventh Circuit considered the circumstances under which a public agency's promise not to enforce a statute rendered the case moot. The procedural circumstances were similar to those in this case. In July 2002, the State of Wisconsin enacted a statute that changed state campaign finance laws, effective July 1, 2003. 366 F.3d at 487. The same month it was enacted, however, the Wisconsin Attorney General conceded in a petition to the Wisconsin Supreme Court that the statute was unconstitutional. *Id*. By December 2002, in a suit against the Wisconsin State Elections Board ("Board"), a federal district court had declared the statute invalid under the First Amendment; but the law remained on the books. *Id*. at 488. In January 2003, plaintiffs, an advocacy group and a political action committee, sought an advisory opinion from the Board declaring that it would not enforce the statute against plaintiffs, but the Board declined to issue such an opinion, and in July 2003, plaintiffs sued in federal court for injunctive relief. *Id*. At this point, with litigation pending,

the Board changed course and promised, via a letter to plaintiffs, that it would not enforce the statute against plaintiffs because it considered the statute "to be unconstitutional and void." *Id*. Also after the suit was filed, the Board declared on its website that it did not intend to enforce any part of the statute held unconstitutional. *Id*. The Board asserted that the plaintiff "lacked standing, or alternatively, that the case [was] moot." *Id*. at 489. The district court agreed and dismissed the suit.

On appeal, the Seventh Circuit addressed both standing and mootness. The court concluded that Plaintiff did not have standing because the court was "not convinced that, at the time of the commencement of the suit, there was a 'reasonable probability' that the Board would enforce the statute." *Id*. at 490. In fact, the court noted that "it is highly unusual to seek injunctive relief when a judgment that was not appealed has already rendered a challenged statute unconstitutional, . . . ." Nevertheless, because an injunction entered against the Board in another case did not formally bar the Board from proceeding against these plaintiffs, and the Board had refused to promise it would not do so, the court was unwilling to characterized plaintiffs' argument in favor of standing as frivolous, as the Board urged. *Id*. at 489-90. Still, the court pointed out, by its failure to appeal the decision holding the statute unconstitutional, the Board had implicitly "conceded that the statute was unconstitutional." *Id.* Moreover, plaintiffs had made "no effort to satisfy [their] burden of persuasion by showing that any Wisconsin official, let alone the Board, ha[d] ever tried to enforce a statute" under circumstances where the statute was held unconstitutional, that same holding was not appealed, and the state's attorney general had conceded that statute was unconstitutional. *Id*.

As *Wis. Right to Life, Inc.* illustrates, in assessing the parties' standing arguments, this court must consider evidence of enforcement efforts after the *Alvarez* and state court decisions because such evidence (or the lack thereof) will shed light on whether there is "reasonable probability" that the Defendants will enforce the IEA against Plaintiff. Plaintiff here offers no evidence of IEA

8

enforcement after the *Alvarez* decision or the state court decisions holding the IEA unconstitutional as applied. (State's Att'y Reply [105] at 7).

The *Wis. Right to Life* court addressed mootness as well. It concluded that "even assuming *arguendo* that [plaintiffs] had Article III standing" at the commencement of the litigation, "the Board's subsequent actions have mooted the case." 366 F.3d at 490, 91. In assessing mootness, the court must "consider any changes in the relationship between the parties that have occurred since . . . the litigation commenced." *Id*. Those changes included that, after plaintiffs filed suit, the Board had finally issued a letter announcing that it would not enforce the statute and had placed a disclaimer in its website. *Id.* at 491. The Board's promise was "extremely credible," the court concluded, in light of the fact that it had "never enforced the statute in the past." *Id*. at 492. And because the Board members are public officials, the court placed "'greater stock in their acts of self-correction, as long as they appear genuine.'" *Id*. at 492 (quoting *Fed'n of Adver. Indus. Reps., Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003). Ultimately, the court concluded that the Board's announcements, including the letter to plaintiffs and the disclaimer on its website, showed that the statute would "not be enforced in the future, [meaning that] there is no behavior to enjoin." 366 F.3d at 491. "Federal courts do not, as a rule, enjoin conduct which has been discontinued with no real prospect that it will be repeated." *Id*. (quoting *Ragsdale v. Turnock*, 841 F.2d 1358, 1365-66 (7th Cir. 1992), *appeal dismissed*, 503 U.S. 916 (1992).) And the Board's conduct in response to the lawsuit satisfied the Court of Appeals that there was "no real prospect that the Board will ever enforce this statute" and, hence, "no case or controversy." *Id*. at 491. A case is moot, the court announced, "when a state agency acknowledges that it will not enforce a statute because it is plainly unconstitutional, in spite of the failure of the legislature to remove the statute from the books." *Id*. at 492.

The circumstances in this case are very similar to those in *Wis. Right to Life* in all of the following ways: (1) Plaintiffs challenge a statute still on the books, but held unconstitutional in a

9

separate case in which the defendant public officials had defended the law; (2) Defendants did not appeal that holding; (3) Defendants had refused, prior to this litigation, to promise they would not enforce the statute against Plaintiff; (4) then, after this lawsuit was filed, Defendants reversed course and promised publicly not to enforce the statute; but (5) Defendants do retain the discretionary authority necessary to break such a promise, should they choose to do so; and (6) the Defendant public officials who have promised nonenforcement have limited tenure. In *Wis. Right to Life*, where all of those circumstances existed, the court nevertheless found plaintiffs' challenge moot because there was no "real prospect" that defendants would enforce the statute against them.

*Wis. Right to Life* is controlling authority, but Plaintiff here argues that it is distinguishable for two reasons. First, Plaintiff notes that in that case, neither the defendant nor anyone else had enforced the law against the plaintiffs or any other party. In this case, the Lindenhurst Defendants did arrest Plaintiff and, although the State's Attorney declined to prosecute him, there is evidence that the statute had been enforced in other parts of Illinois, circumstances that Plaintiff urges "reinforce" his fear of future enforcement. (Pl.'s Reply [89] at 6-7). Second, Plaintiff believes that public officials' announcements that they will not enforce the law have less credibility than they did in *Wis. Right to Life*. In that case, the state attorney general was not a party to the litigation; had never defended the law in court; and had declared it unconstitutional even before litigation commenced. Attorney General Lisa Madigan is a Defendant in the case before this court and did, for a time, argue in favor of the statute. As Defendants point out, however, there is no evidence that the statute has been enforced at all since the entry of the *Alvarez* decision, which is the event, along with the state court decisions, that caused the State's Attorney and Attorney General to issue their declaration. (Def.'s Reply [105] at 7).

Plaintiff contends that public officials' pre-*Alvarez* enforcement efforts spare this case from a finding of mootness. He cites *Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012), where a war protestor

10

challenged a Chicago ordinance that required him to leave the scene because of the disorderly conduct of other individuals. Local officials had arrested and prosecuted the plaintiff, and the Seventh Circuit reversed a determination that he lacked standing to seek an injunction against the ordinance's further enforcement. *Id*. at 450. In holding that a "sufficient likelihood of injury" existed, the court reasoned that plaintiff's "past experience with the ordinance lends credibility to his assertion that the City will enforce it." *Id*. at 454. Unlike the *Wis. Right to Life* case and unlike this one, however, no court had found the law unconstitutional and no official had promised not to enforce it based on that holding. Notably, in a subsequent challenge to the disorderly conduct ordinance, the Seventh Circuit concluded that the *Bell* opinion, which partially invalidated the ordinance, rendered the later plaintiff's facial challenge moot. *See Thayer v. Chizcewski*, 705 F.3d 237, 256 (7th Cir. 2012).

Plaintiff cites other cases, as well, but none involve situations in which a statute has been stricken by another court and public officials have stated they will not enforce it. In *Wilson v. Stocker*, 810 F.2d 943 (10th Cir. 1987) (Pl.'s Reply [89] at 6), the Tenth Circuit agreed with the plaintiff that a state statute prohibiting the anonymous distribution of campaign literature was unconstitutional. Plaintiff had been arrested and charged under the statute, but as in this case, the state attorney general urged that there was no case or controversy between plaintiff and the attorney general because he was not involved in plaintiff's prosecution. The attorney general was properly sued in his official role, however, and in that official role defendant continued to argue in defense of the law's constitutionality. *See* 810 F.2d at 948 ("On appeal, the attorney general argues that the above statute . . . . is constitutional . . . ."). Somewhat more recently, in *Ward v. Utah*, 321 F.3d 1263, 1264-65 (10th Cir. 2003) (Pl.'s Reply [89] at 6), a plaintiff sought declaratory and injunctive relief after being arrested, but never prosecuted, under a disorderly conduct statute. The court concluded that plaintiff had standing because defendant public officials refused to state whether the statute applied to plaintiff's activities and gave no assurances they would not charge

11

plaintiff under the statute. *Id*. at 1268. The situation is different, the *Ward* court noted, in circumstances where a prosecutor has made "an explicit declaration . . . that a challenged statute is inapplicable to a plaintiff's behavior." *Id.* at 1268. Such a declaration would, the court held, make it clear that plaintiff did not face a genuine threat of prosecution. *Id.*, citing *Faustin v. City and County of Denver,* 268 F.3d 942, 948 (10th Cir. 2001); *PETA v. Rasmussen,* 298 F.3d 1198, 1203 (10th Cir. 2002).

As Plaintiff correctly notes, evidence that a statute or ordinance has been enforced in the past supports a finding that it is likely to be enforced in the future. The Ninth Circuit emphasized this factor in *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134 (9th Cir. 2000), where plaintiff landlords challenged an ordinance that prohibited them from discriminating against unmarried couples. In dismissing the challenge as unripe, the court pointed out that no tenants had ever filed a complaint, nor had state officials had never threatened any action. Similarly, in *Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010), plaintiff, a college student, believed the college's sexual harassment policy interfered with his First Amendment rights, but the court found there was no credible threat that the policy would be enforced against him. In reaching its conclusion, the court acknowledged that "a government's preliminary efforts to enforce a speech restriction or its past enforcement of a restriction [is] strong evidence (although not dispositive) that pre-enforcement plaintiffs face a credible threat of adverse state action," but "general threats" by officials are not sufficient to make such a showing. *Id*. at 786, 787. Neither *Thomas* nor *Lopez* comment on the situation in which public officials have given assurances that they will not enforce the challenged statute.

Plaintiff also argues that Defendants' prior defense of the statute as constitutional renders the Defendants' promises insufficient. (Pl.'s Reply [89] at 11). In the cases he cites, however, defendants had made no such promises. First, Plaintiff cites *Parents Involved In Community Schools, Inc. v. Seattle School District* No. 1, 551 U.S. 701 (2007). (Pl.'s Reply [89] at 12.) In that

12

case, parents sued a school district, challenging a student assignment plan that relied on racial classifications. The school district argued that the plaintiffs lacked standing because none had attempted to enroll their children in the schools at issue, and because the district discontinued the policy during the litigation. The Supreme Court disagreed, noting that "the [defendant] district vigorously defends the constitutionality of [the policy], and nowhere suggests that if this litigation is resolved in its favor it will not resume [enforcement of the policy]." 551 U.S. at 719. "Voluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,'" the Court explained. *Id*. at 719 (citations omitted). The circumstances here, where courts have invalidated the challenged law, and, in response, state officials have declared they will not enforce it, are such "subsequent events." As this court reads *Parents Involved*, the Court did not require that it be "absolutely clear" that wrongful behavior would not recur; it instead required only that it be clear the wrongful behavior cannot *reasonably* be expected to recur. Thus, the court will not demand, as Plaintiff suggests, "absolute clarity about the future use" of the IEA, (Pl.'s Reply [89] at 12), to conclude that enforcement against Plaintiff cannot be reasonably expected to recur.

Second, Plaintiff cites *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008). (Pl.'s Reply [89] at 11-12.) In *DeJohn*, as in *Lopez*, a student challenged the university's sexual harassment policy on First Amendment grounds. After litigation was filed, the university modified its policy and moved to dismiss the case as moot. *Id*. at 306. The court denied the motion, holding that the defendant's "voluntary revision of its policy" did not render the case moot. *Id*. at 311. As Plaintiff emphasizes, (Pl.'s Reply [89] at 12), the court noted that the defendant "did not change its policy for more than a year after the commencement of litigation." *DeJohn*, 537 F.3d at 309. The court added, however, that "more importantly, [defendant] defended and continues to defend not only the constitutionality of its prior . . . policy, but also the need for the former policy." *Id*. at 306. A private defendant's cessation of a policy while it continues to defend the policy as constitutional

13

is not equivalent to a state official who no longer defends a statute as constitutional and announces that it will no longer enforce the statute.

Plaintiff also argues that the discretionary authority and limited tenure inherent in the State's Attorney and Attorney General positions renders their non-enforcement promises insufficient to render the case moot. (Pl.'s Reply [89] at 8-10.) The same circumstances existed in *Wis. Right to Life,* however. Nor do other authorities Plaintiff cites control this case, where the ordinance has now been invalidated by another court and the public official acknowledges it is unenforceable under the constitution. *See United States v. Stevens*, 559 U.S. 460, 462 (2010) (government defended constitutionality of statute, arguing it would be construed narrowly); *Kucharek v. Hanaway*, 902 F.2d 513, 518-19 (7th Cir. 1990) (attorney general offered "implausible" interpretation of a challenged statute and had not committed himself to denying approval for future prosecutions); *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) (defendant argued that it would not interpret the statute as applying to plaintiff's activities); *Vittitow v. City of Upper Arlington*, 43 F.3d 1100,1106 (6th Cir. 1995) (defendant's counsel makes representation of narrow tailoring); *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1192-93 (defendant insisted during litigation that under its narrow construction of the statute, plaintiffs would not be prosecuted); *Solomon v. City of Gainesville*, 763 F.2d 1212, 1213-15 (11th Cir. 1985) (ordinance held facially unconstitutional due to overbreadth and vagueness after officials stopped enforcing but continued to defend constitutionality).

Plaintiff also cites the district court's opinion in *Brown v. Herbert*, No. 2:11-CV-0652-CW, 2012 WL 3580669 (D. Utah Aug 17, 2012). (Pl.'s Reply [89] at 10). In *Brown,* a group of polygamists sued several state and local officials challenging Utah's anti-bigamy laws. *See Brown v. Herbert*, 850 F. Supp.2d 1240 (D. Utah 2012). Defendant, a state official, moved to dismiss the case as moot because he had adopted a policy of non-enforcement after the litigation commenced. *Brown*, 2012 WL 3580669 at *1. Though the defendant made a formal declaration

that he had adopted the policy, under the penalty of perjury, the court was not satisfied that the litigation was moot: "There is no reason to believe that such a determination is anything beyond an exercise in prosecutorial discretion that could easily by reversed . . . by a successor . . . or [defendant] himself, if he should change his mind." *Brown*, 2012 WL 3580669 at *4. Other language in the court's opinion, however, reveals key distinctions between the circumstances in *Brown* and those before this court:

> The failure to give public notice of the change in policy, however, adds to the concern that the action was taken primarily for purposes of this litigation.
>
> It should also be noted that in [defendant's] declaration and in the adopted policy itself, [defendant] reserves the right to prosecute individuals for violating . . . [the] statute . . . .
>
> Defendant has not indicated what the reasoning is behind the newly adopted non-prosecution policy . . . .
>
> . . . . [Defendant] has also made no indication that he is abandoning his defense of the constitutionality of the challenged statute. [Defendant]'s continued defense of the statute makes it difficult to conclude that there is no reasonable expectation that [p]laintiffs would be prosecuted under the statute in the future.

*Id*. at 3-4.

In the instant case, Defendants have given public notice of the policy change, they have explained their reasoning, and they have abandoned the defense of the IEA as constitutional. Thus, it is not "difficult to conclude that there is no reasonable expectation that [P]laintiff would be prosecuted under the statute in the future." *Id*.

When Plaintiff filed this lawsuit, he unquestionably had standing to challenge the enforcement of the IEA. Several other plaintiffs have challenged the Act, as well, however, and those challenges have succeeded. The federal courts have declared the Act unconstitutional, and public officials have conceded the point, announcing publicly that they will not enforce it. Since the time of those decisions and public declarations, there have been no new prosecutions. In short,

15

Plaintiff Frobe no longer has a reasonable expectation that the Act will be enforced against him. His claim for injunctive relief is moot.

## CONCLUSION

Attorney General Lisa Madigan's motion to dismiss [71] is granted. Plaintiff's motion for summary judgment on Count I [94] is stricken.

ENTER:

Dated: September 30, 2013

*[signature]*

REBECCA R. PALLMEYER
United States District Judge